UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:24-cv-20188

JONATHAN E. PERLMAN, Esq.,
as court-appointed Receiver of
TCA Fund Management Group Corp., *et al.*,

      Plaintiff,

v.

GRANT THORNTON CAYMAN ISLANDS,
GRANT THORNTON IRELAND,

      Defendants.

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Jonathan E. Perlman, as the court-appointed Receiver (the "Receiver") for TCA

Global Credit Fund, LP, TCA Global Credit Fund, Ltd., TCA Global Credit Master Fund, LP, and

TCA Global Lending Corp. (the "Receivership Entities"), sues Defendants: (1) Grant Thornton

Cayman Islands, and (2) Grant Thornton Ireland (together, the "Grant Thornton Defendants"), and

alleges:

## INTRODUCTION

1.     This is an action against the Grant Thornton Defendants for enabling and failing to

prevent the gross mismanagement of the Receivership Entities by certain former insiders of TCA

Fund Management Group Corp. ("Fund Management"). Fund Management was the SEC-

registered investment advisor for TCA Global Credit Master Fund, LP ("Master Fund"), the

primary fund in a "master-feeder" structure, in which "Feeder Funds" funneled outside

investments to Master Fund, where they were invested at the direction of Fund Management. The

Feeder Funds are TCA Global Credit Fund, LP ("Feeder Fund LP") and TCA Global Credit Fund,

Ltd. ("Feeder Fund Ltd.") (together with Master Fund, the "Funds"). TCA Global Credit Fund GP, Ltd. ("GP"), was the general partner of Feeder Fund LP and Master Fund

2.     Fund Management earned fees based on Master Fund's Net Asset Value ("NAV"), which is a critical benchmark of investment performance that is published monthly and included in audited financial statements. The NAV is the net value of an investment fund's assets less its liabilities. The NAV may represent the value of the total equity, or it may be divided by the number of shares outstanding held by investors, thereby representing the net asset value per share. A misstated NAV misrepresents the financial health and potential solvency of an investment fund. Certain insiders at Fund Management artificially inflated the NAV, which Grant Thornton Defendants' actions allowed to continue, resulting in Master Fund overpaying Fund Management and GP millions of dollars. In fact, the NAV was grossly overstated as Master Funds' assets turned out to be worth some $400 million less than the value reflected in Master Funds' audited financial statements prepared by the Grant Thornton Defendants.

3.     Master Fund's business was to make high-interest, collateralized loans to micro- and small-cap companies. The NAV was inflated by bad loans and phantom investment advisory fees, among other things.

4.     The Grant Thornton Defendants were supposed to act together as an "independent" auditor, but knowingly ignored and downplayed evidence that almost all the supposed investment advisory fees were uncollectible, or that Master Fund had never become entitled to the fees at all because they related to a proposed transaction that had never actually occurred. No later than April 2018, nearly two years before the Funds ceased operating, the Grant Thornton Defendants obtained actual knowledge that a sizeable part of Master Fund's supposed investment portfolio lacked any support, and that numerous significant accounting control deficiencies posed a risk of material

misstatements in the Master Fund's audited financial statements.  In fact, the Grant Thornton Defendants expressly acknowledged these significant issues in draft audit reports and correspondence. Yet, the material that the Grant Thornton Defendants chose to publish in connection with Master Funds' audited financial statements downplayed, glossed over, or outright omitted such issues. This was no accident. Communications show a calculated effort, enabled by the Grant Thornton Defendants, to sanitize the findings of the Grant Thornton Defendants' own audit, causing the Funds to continue operating despite their desperate financial condition.

5.      Millions of dollars in damages to the Receivership Entities would not have occurred but for the Grant Thornton Defendants' improper practices and their enabling the deception described above and alleged in detail below. Accordingly, the Receiver brings this action against the Grant Thornton Defendants for damages under Cayman law on grounds alleged in detail below.

### PARTIES, RELEVANT NON-PARTIES, JURISDICTION AND VENUE

6.      The Receiver was appointed by the United States District Court for the Southern District of Florida ("Enforcement Court") in the case *Securities and Exchange Commission v. TCA Fund Management Group Corp. et al., No. 20-21964-CMA (S.D. Fla.)* ("Enforcement Case"**)**. The Enforcement Court has authorized, empowered and directed the Receiver to bring actions for the benefit of and on behalf of the Receivership Estate.

7.      Before the Receiver's appointment, the Funds were controlled by a Board of Directors ("Board") comprised of three directors, namely, (1) Robert Press ("Press") and two Independent Directors, namely, (2) Bruce Wookey ("Wookey") and (3) Bernard Sumner ("Sumner") (Wookey and Sumner together, the "Independent Directors").[1] More specifically, the Independent Directors and Press were the directors of Master Fund; the directors of Feeder Fund

---

[1] Sumner replaced Matthew Luciano as director in 2018 or 2019.

Ltd.; and the directors of GP.

8.      The Independent Directors maintain that (a) they had no knowledge of nor participation in any of the improprieties alleged herein; (b) such practices were carried out by certain rogue actors not located in the Fund Management's main office in South Florida; and (c) the Board relied upon Master Fund's auditors and administrators—including the Grant Thornton Defendants—to bring any improprieties to the Board's attention, which never occurred.

9.      The Independent Directors had the ability to direct the affairs of the Receivership Entities and prevent the ongoing grossly reckless mismanagement and fraud had the Grant Thornton Defendants complied with their duties and obligations and informed the Independent Directors of what was occurring, instead of enabling the wrongful conduct.

10.     Press was the Founder and Director of Master Fund and of Fund Management. Press is a resident of the State of Florida. According to SEC-filed form ADV for Fund Management, Fund Management was controlled and majority-owned by Press.

11.     Alyce Schreiber was the acting Chief Executive Officer of Fund Management. Schreiber is a resident of Florida.

12.     William "Bill" Fickling was the acting Chief Operating Officer of Fund Management. Fickling is a resident of Georgia.

13.     Donna Silverman was the former chief portfolio manager of Fund Management. Silverman is a resident of New Jersey.

14.     Patrick Primavera was the former managing director of Fund Management. Primavera is a resident of New York.

15.     Tara Antal was the Chief Compliance Officer of Fund Management. Antal is a resident of Florida.

16.     Grant Thornton Cayman Islands ("GT Cayman") is a legal entity organized under the laws of the Cayman Islands.

17.     Grant Thornton Ireland ("GT Ireland") is a legal entity organized under the laws of Ireland.

18.     This Court has jurisdiction over each of the Defendants under 28 U.S.C. §§754 and 1692 and has subject matter jurisdiction over this matter under 28 U.S.C. §§754, 1367 and 1692. Venue is proper in this Court.

19.     The Court has personal jurisdiction over each of the Grant Thornton Defendants (GT Cayman and GT Ireland) because the Grant Thornton Defendants committed the tortious acts at issue in Florida, including by: (i) attending in-person meetings with Fund Management in Florida and New York through representatives of each of the Grant Thornton Defendants on at least three different occasions; (ii) directing substantial telephone and email communications to Fund Management in Florida ; (iv) engaging in communications with borrowers/clients of Master Fund located in Florida in the course of conducting audits; (iii) sending final audit reports to Fund Management in Florida that contained misrepresentations and omissions; (iv) providing the foregoing assistance pursuant to engagement letters provided to and signed by Press in Florida; (v) receiving payment for its services from Fund Management in Florida; (vi) being engaged to provide auditing services in compliance with U.S. laws, regulations, auditing standards, and for dissemination to investors and others located in Florida; and (vii) causing damage to Receivership Entities, whose business operations were based in Florida. Based on the foregoing, the Grant Thornton Defendants purposely availed themselves of the privilege of conducting activities in Florida, the Receiver's claims arise out of and relate to those contacts, and personal jurisdiction over the Grant Thornton Defendants comports with traditional notions of fair play and substantial

justice.

20.     Pursuant to 28 U.S.C. § 1391(b), venue is proper in the Southern District of Florida because a substantial part of the events or omissions giving rise to the claims occurred in this District, specifically in Aventura, Florida.

**FACTS COMMON TO ALL COUNTS**

**A.     The Whistleblower Complaint and SEC Complaint concerning the Funds' Improper Revenue Recognition Practices.**

21.     In January 2020, NBC News issued a breaking story that an SEC whistleblower complaint had been filed accusing the Receivership Entities of inflating both their earnings and assets for years.

22.     According to the whistleblowers, certain bad actors within Fund Management were inflating the Funds' assets by failing to book losses on defaulted loans, and by recording revenues that it had not received in the form of phantom "advisory fees" that were never earned. Per the whistleblowers, certain bad actors had inflated these numbers since 2017, if not earlier, and the Receivership Entities had at most $300 million in assets, not the $500 million reported to investors.

23.     On May 11, 2020, the Securities and Exchange Commission ("SEC") filed its *Complaint for Injunctive and Other Relief* (the "SEC Complaint"), initiating the Enforcement Case against Fund Management and Master Fund's general partner, GP. The SEC sought to enjoin violations of the federal securities law by Fund Management and GP.

24.     The SEC named the Funds as "Relief Defendants" in the Enforcement Case, meaning that the SEC sued the Funds not because of misconduct on their part, but rather to ensure a proper wind-up of their business and a fair and appropriate distribution to the Feeder Funds' approximately 470 investors.

25.     Before the Receiver's appointment, the businesses of and relationship among the Receivership Entities was as follows: The Feeder Funds raised money from investors through private sales of securities. The Feeder Funds invested the funds that they raised in Master Fund, which provided short-term secured financing, and purported to provide investment banking services to small- and medium-size businesses. Fund Management was the Funds' investment advisor and received compensation from Master Fund based on the amount of the Funds' assets, i.e., based upon the NAV. Fund Management was paid a pro rata monthly "management fee" equal to a range of 1.5% to 2% per year of the Funds' NAV. GP was compensated based upon a monthly "performance allocation" equal to a range of 20% to 25% of Master Fund's realized and/or unrealized net profits.

26.     The SEC Complaint alleged that since 2010 and continuing through at least November 2019, Fund Management engaged in revenue recognition practices that inflated Master Fund's revenue (and therefore profits) and, as a result, the Funds' NAV by using two methods.

27.     According to the SEC Complaint, the first method involved Master Fund's lending business between in or about April 2010 and December 2016. In this method, the prospective borrower and Master Fund would sign a term sheet outlining the terms of a loan, including the amount of fees the borrower would pay Master Fund when the loan transaction was consummated. Fund Management would then cause Master Fund to recognize the prospective loan fees as revenue upon execution of the term sheet (as opposed to loan closing), even though the term sheets were not binding and, in many cases, did not lead to a funded loan, such that the loan fee was never earned. Recognizing the loan fee revenue at the time of term sheet execution artificially increased Master Fund's profits and the NAV until the loan was funded or written off by Fund Management.

28.     The second method that Fund Management used to inflate Master Fund's revenue, profits, and the NAV according to the SEC Complaint occurred between in or about the latter half of 2016 and November 2019, and involved agreements for Master Fund to provide investment banking services. In connection with financing transactions, borrowers were usually required to sign an "investment banking" or "advisory services" agreement with Master Fund that required the borrower to pay an "investment banking" or "advisory" fee to Master Fund that was "earned upon execution" of the agreement (the "IB Fees"). The IB Fees ranged in amounts from hundreds of thousands to millions of dollars. According to the SEC, Fund Management caused Master Fund to recognize these IB Fees as revenue at the time the agreement was signed even though (a) these companies lacked the financial wherewithal to pay the fees unless Master Fund was successful in obtaining financing for the company, which rarely occurred, and (b) Master Fund had provided few if any services at the time the agreement was signed.

29.     According to the SEC, Fund Management knew that Master Fund was unlikely to be paid the vast majority of the IB Fees.

30.     Indeed, according to the SEC Complaint, many of the companies that sought financing from Master Fund had insufficient cash to meet their working capital needs, and many used the loan proceeds to repay other debts. A substantial portion of the loans extended by Master Fund defaulted and ended up in litigation, as alleged in more detail below.

31.     The SEC Complaint further alleged that Fund Management knew (or was severely reckless in not knowing) that Master Fund had performed few if any of the services recited in the underlying investment banking agreements at the time they were signed. Many of the companies in question later denied owing any money to Master Fund under the agreements.

32.     The SEC Complaint alleged that the booking of investment banking revenue at the time of agreement execution inflated the NAV by at least $130 million as of November 2019, and resulted in Fund Management causing Master Fund to improperly recognize at least $155 million in cumulative revenue from September 2016 through November 2019.

33.     According to the SEC Complaint, Fund Management knowingly distributed to investors monthly account statements falsely representing the amount of their monthly returns and investment balances based on the inflated NAV. Indeed, the Funds never reported a down month. Yet without Fund Management's improperly recording the IB Fees as revenue, the Funds would have had numerous months of negative returns since inception according to the SEC's allegations.

34.     As alleged by the SEC, Master Fund's audited financial statements for 2017 included qualified opinions with respect to all of Master Fund's investment banking income of $79.7 million (which was 70% of Master Fund's total income) and with respect to assets of approximately $195 million (comprising approximately 44% of Master Fund's NAV). For 2018, the audited financial statements included qualified opinions with respect to $61.6 million in investment banking income (which was about 47% of Master Fund's total income) and assets totaling approximately $384 million (comprising about 89% of Master Fund's NAV). Further, as noted in the 2018 financial statements that $53,517,722, or 46% of the loans outstanding, were in litigation and that the auditor could not confirm the validity of an additional $8,658,952, or 8% of the loans outstanding, or could not be confirmed. These qualifications, however, failed to convey the whole truth to investors; rather, they downplayed or outright omitted Fund Management's control and accounting deficiencies.

35.     The SEC alleged that Master Fund's cash position deteriorated considerably in the period 2017-2020: while Master Fund historically held 20% to 30% of its assets in cash, beginning

in March 2018, its cash position had decreased to less than 10% of its assets, and beginning in May 2019, that amount declined to below 5% of total assets.

36.     On January 21, 2020, the Feeder Funds sent letters to their investors advising that the Funds would be winding up their affairs, citing, among other things, that the Funds had received redemption and withdrawal requests in excess of the Funds' available cash, that the Funds had grown increasingly illiquid, and that Funds' continued operation was not commercially viable.

**B.     The Consent Judgment, Order Appointing the Receiver, and the Receiver's Investigation of the Receivership Entities' Financial Affairs.**

37.     On May 11, 2020, the Enforcement Court entered its Order Granting Plaintiff Securities and Exchange Commission's Unopposed Expedited Motion for Appointment of Receiver ("Receivership Order"). The Enforcement Court found that the appointment of a receiver was necessary and appropriate for purposes of marshaling the Receivership Entities' assets that: (a) are attributable to funds derived from investors or clients of the Receivership Entities; (b) are held in constructive trust for the Receivership Entities; (c) were fraudulently transferred by the Receivership Entities; and/or (d) may otherwise be includable as assets of the estates of the Receivership Entities. The Receivership Order appointed the Receiver for the foregoing purposes, among others, with the authority and powers of a receiver at equity, and all powers conferred upon a receiver by the provisions of 28 U.S.C. §§ 754, 959 and 1692, and Federal Rule of Civil Procedure 66.

38.     On May 12, 2020, the Enforcement Court entered its Judgment of Permanent Injunction and Other Relief against Fund Management and GP. Fund Management, GP, and the other Receivership Entities consented to the judgment without admitting or denying the allegations of the SEC Complaint. The judgment permanently enjoined Fund Management and GP from engaging in conduct that violated the securities laws.

39.     In the Receivership Order, the Enforcement Court authorized, empowered and directed the Receiver to investigate the manner in which the financial and business affairs of the Receivership Entities were conducted and (after obtaining leave of the Enforcement Court) to bring actions and legal proceedings for the benefit and on behalf of the Receivership Estate, including actions for the avoidance of fraudulent transfers. The Receiver subsequently sought and obtained leave of the Enforcement Court to bring this action. [Enforcement Case ECF Nos. 155, 156].

40.     After being appointed, the Receiver and his professionals took possession and control of the Receivership Entities' books, records, information technology systems, accounts, other property, and operations; conducted interviews with their officers, directors, and employees; and conducted a forensic accounting of the Receivership Entities' assets and transactions, among numerous other tasks.

41.     Consistent with the allegations in the SEC Complaint, the Receiver determined that the Funds' financial condition as reflected in its public filings failed to reflect the true picture. Indeed, the value of the assets that came into the Receiver's possession was far less than reported in the Funds' NAVs. For example, the last NAV that Master Fund reported before the Receiver's appointment (the November 2019 NAV reported in December 2019) reflected a loan portfolio with principal valued at nearly $178 million. However, less than $4 million in loans was performing at that time. The same NAV included a special purpose vehicle ("SPV") portfolio valued at approximately $115.5 million, but the Receiver estimates that the actual value of the SPV portfolio is approximately $73.8 million (this estimate is subject to change as the Receiver's investigation continues and new information develops). The NAV also included over $135 million in IB Fees, the vast majority of which were uncollectible and valueless. Thus, while Master Fund reported a NAV of approximately $516.1 million against investor claims of approximately $343.9 million,

that was based on assets overstated by over $345 million. In other words, Master Fund's liabilities exceeded its assets by many millions of dollars.

42.     Starting no later than 2015, Master Fund's financial reports included inflated assets, as described in more detail below, under management and gross asset values, which were used to calculate inflated compensation that Fund Management caused Master Fund to pay Fund Management and GP. Fund Management and GP calculated their fees based on the inflated financial performance numbers despite that the investment portfolio was worth far less than what was being reported to investors and being used to calculate such fees.

43.     The Receiver found upon conducting his investigation that Master Fund's loan portfolio was overvalued for a number of reasons, consistent with the SEC's allegations. The loan portfolio consisted of borrowers that were in poor financial condition and desperate for cash, and the collateral pledged to secure Master Fund's loans had little, if any value. This debt was not written off even when it was obviously worthless so that the debt continued to accrue interest that would never be paid. The interest was then reported as fictitious returns, the phantom revenue was used to calculate the NAV and, in turn, Fund Management's compensation from Master Fund.

44.     Loans were not written off even after Master Fund's security interest securing the loans (which often were secured by equity in the borrower in loan-to-own type arrangements) had been foreclosed and converted to equity. Most of these acquired equity interests had little to no value.

45.     This information concerning Master Fund's loan portfolio is consistent with the realities that the Receiver faced when he took over the Funds' operation, including servicing the debt portfolio. Although the Funds' prospectuses, annual financial audits, and monthly and other reports suggested that one of the Funds' most valuable asset categories should have been

performing loans, the Receiver discovered that there were only two performing loans. A handful of others were paying regularly, but in amounts far less than the monthly amounts due. The remainder of the loan portfolio was entirely non-performing.

46.     As of February 2021, twenty-three (23) loans, totaling $85.5 million, had been transferred by the Receiver to attorneys to initiate collection proceedings (this amount is in addition to loans that were already not performing and in collection on the receivership date). The collections on these loans has been nominal in relation to the amounts owed.

47.     The information learned in the Receiver's investigation also corroborates material allegations in the SEC's Complaint concerning the IB Fees.

48.     Master Fund's books included approximately $59 million in IB Fees in 2017, but most of these fees were not collected, nor was any viable investment banking plan ever applied to service the underlying investment banking agreements. In fact, none of the Receivership Entities ever employed an investment banker. The underlying agreements were merely pieces of paper with no viable work or services to back them up. Moreover, although the investment banking agreements were entered into as part of loan transactions (i.e., Master Fund agreed to fund a loan and then provide investment banking services to the borrower), millions of dollars in IB Fees recorded in 2017 were associated with transactions that never closed. These "orphaned" IB Fees were recorded on Master Funds' balance sheet and used to calculate the NAV even though they would never be collected because the borrower had agreed to pay them in connection with a loan transaction that never closed.

49.     The Funds' financial position continued to worsen in 2018. By March 2018, Master Fund's cash had decreased to less than 10% of its assets. Master Fund historically held 20% to 30% of its assets in cash.

50.     Master Fund booked approximately $61 million in IB Fees in 2018, but only a fraction of those fees were associated with deals that actually closed and funded loans. The low level of funding as compared to prior years resulted in part from Master Fund's increasing liquidity constraints. Unbeknownst to the Funds' Independent Directors, Master Fund was carrying millions in orphaned fees on its books even though the fees related to loan deals that never funded.

51.     Of the approximately 58 transactions involving IB Fees that Master Fund entered into in 2018, only two deals were internally categorized as "good." The vast majority of deals (over 60%) were internally categorized as "bad," meaning the deals needed to be written off. But the deals were not written off. Instead they appeared on Master Fund's books and were reported as revenue.

52.     The Funds' financial position continued to worsen in 2019. By May 2019, Master Fund had only 5% of its assets in cash, while historically holding 20-30% of its assets in cash. The balance of Master Fund's assets consisted mostly of amounts owed on loans to thinly capitalized borrowers, a substantial amount of which were in default.

53.     Master Fund booked approximately $39 million in IB Fees in 2019, but only a fraction of that amount related to deals that actually closed and funded. The very low level of funding as compared to prior years resulted in part from Master Fund's severe liquidity constraints. Millions of dollars in orphaned fees appeared on Master Fund's books even though they related to loan deals that never funded.

54.     Of the approximately 68 transactions involving IB Fees that Master Fund entered into in 2019, only 14 deals were internally categorized as "good." Thirty-one of the 68 deals, amounting to over $19.7 million of the $39 million booked (over 50%), were internally categorized as "bad," meaning the deals needed to be written off. But they were not written off. Instead, they

appeared on the books of Master Fund and were reported as revenue.

55.     As of January 2020, it appears that Master Fund only collected a fraction of $39 million in IB Fees booked in 2019.

56.     By November 2019, the NAV was inflated by at least $130 million due to IB Fees that, unbeknownst to the Funds' Independent Directors, Master Fund could never collect.

57.     No later than December 2019, the Funds' financial position had deteriorated to the point that new investor subscriptions were being used to pay redemptions. In other words, money from new investors was being used directly to pay for distributions to prior investors without any intervening investing occurring. A substantial part of the $100 million in redemptions paid in 2019 had its source in new investor subscriptions.

58.     In the period 2017 through 2019, approximately 40% of the Funds' estimated $500 million in assets under management consisted of IB Fees arising from investment banking agreements that would never be paid because the underlying loan transactions never closed. Even when loans did close, compensable investment banking work rarely was performed. As alleged above, the Receivership Entities never employed an investment banker.

59.     Moreover, the Funds' other assets consisted of loans to borrowers that were not creditworthy and were thinly capitalized, very few of which actually performed under the loan agreements. Master Funds' underperforming loan portfolio combined with the fraudulent IB Fees meant that 65-75% of all assets under management were non-performing in the 2017 to December 2019 timeframe.

> **C.**     **The Grant Thornton Defendants Enable Bad Actors at Fund Management to Conceal the Funds' Financial Condition from the Independent Directors.**

60.     The motivation for the revenue recognition practices alleged above is the subject of dispute, as is the identity of the individuals responsible for the practices. For example, the SEC

brought administrative proceedings against Press, among others, with respect to the recognition of the IB Fees and other conduct of Fund Management and GP alleged above, which Press settled with the SEC without admitting or denying any misconduct. Press maintained that if IB Fees were improperly recognized, then it was the result of misconduct by rogue employees not located in the South Florida office, including Patrick Primavera, a former managing director of Fund Management located in the New York office.

61.     Regardless of what individuals within Fund Management are to blame, Fund Management grossly and recklessly mismanaged the Funds by engaging in the conduct alleged in detail above, including: (1) causing the NAV to be artificially inflated with phantom advisory fees and bad loans; (2) providing misleading and materially false financial information to third parties; (3) failing to ensure that there were appropriate procedures, policies, and protocols that the loans being provided were credit worthy; and (4) failing to properly wind down the affairs of the Receivership Entities.

62.     Pursuant to its engagement letters with the Funds ("Engagement Letters"), the Board of Directors of GP ("Directors")—which included the Independent Directors—was responsible for the oversight of the Grant Thornton Defendants' work. Under the Engagement Letters, the Grant Thornton Defendants agreed to serve as independent auditor to evaluate Master Fund's statements of financial positions for the years ending 2017 and 2018 "in accordance with auditing standards generally accepted in the United States of America (or 'US GAAS')". Further, the Grant Thornton Defendants undertook the duty to evaluate "the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall financial statement presentation." Copies of the Engagement Letters are attached hereto as **Composite Exhibit A**.

63.     Under US GAAS standards, the Grant Thornton Defendants were required to exercise the degree of skill commonly possessed by auditing firms and were required to conduct the audits with reasonable care and diligence. This required the Grant Thornton Defendants to, *inter alia*, maintain professional skepticism by critically assessing audit evidence; maintain independence and objectivity in all aspects of its audits; obtain a sufficient understanding of the Funds' internal controls to enable Grant Thornton to plan its audits and determine the nature, timing, and extent of necessary tests to be performed; and gather sufficient competent evidence to afford a reasonable basis for their opinions regarding the Funds' financial statements.

64.     Significantly, under the Engagement Letters, the Grant Thornton Defendants agreed to be "responsible for communicating to the Directors significant deficiencies and material weaknesses in internal control over financial reporting that [came] to [the Grant Thornton Defendants'] attention during the course of [their] engagement." The Grant Thornton Defendants further advised that they were "required to obtain reasonable assurance about whether the financial statements [were] free from material misstatement, whether caused by error or fraud to enable [the Grant Thornton Defendants] to express an opinion on whether the financial statements are presented fairly, in all material respects, in accordance with International Financial Reporting Standards (or 'IFRS')."

65.     Additionally, and significantly, the Grant Thornton Defendants advised that in connection with the engagement, professional standards required them to "communicate certain matters that come to our attention to the Directors, such as [a] fraud involving senior management and fraud that causes a material misstatement [b] illegal acts, unless clearly inconsequential [c] disagreements with management and other serious difficulties encountered [d] qualitative aspects of significant accounting practices, including accounting policies, estimates, and disclosures, and

[e] audit adjustments and uncorrected misstatements, including missing disclosures."

66. The Grant Thornton Defendants executed the Engagement Letters and thereafter provided the auditing services using the "Grant Thornton" brand.

67. Each Engagement Letter contains a choice of law provision stating that the Engagement Letter shall be governed by Cayman Islands law.

68. Each Engagement Letter contains an exclusive venue provision favoring the courts of the Cayman Islands, and a "Dispute resolution" provision stating that the parties shall "wherever possible" enter binding arbitration proceedings in the Cayman Islands. However, these provisions are impossible to perform because Cayman law and the courts in the Cayman Islands do not recognize the Receiver as the duly appointed representative of the Funds. Further, the Court Order appointing the Receiver vested the Receiver with "all powers, authorities, rights and privileges heretofore possessed by the officers, directors, managers and general and limited partners of the Receivership Entities under applicable state, federal, or foreign law, by the governing charters, by-laws, articles and/or agreements . . . ." Thus, the Receiver has displaced any members of prior management who may have been competent to authorize the Funds to bring the claims in the Cayman Islands or who may have been competent to direct such litigation on behalf of the Funds. Further, the Order authorizes, empowers, and directs the Receiver to institute in his name actions for the benefit of and on behalf of the Receivership Estate.

69. After replacing Fund Management's prior auditor in late 2017, the Grant Thornton Defendants noticed that there was a lack of support for the purported "advisory fees" and "investment banking fees" reflected on the Funds' books, as alleged above. The Grant Thornton Defendants also saw that there was a lack of support for tens of millions of dollars in indebtedness in connection with a note supposedly payable from Fund Management to Master Fund.

70.   The Grant Thornton Defendants investigated how Fund Management was accounting for the Funds' assets and confirmed their understanding with various inquiries to certain Fund Management officers and a review of the Funds' financial and business records.

71.   As a result of its preliminary investigation, the Grant Thornton Defendants were concerned about, among other things, the timing of income recognition, values not being recorded in accordance with the IFRS, a lack of evidence to support collectability of loans, and uncertainties surrounding litigation outcomes with respect to non-performing loans.

72.   The Grant Thornton Defendants' draft audit findings report for 2017 highlighted significant control deficiencies, including: (i) improper revenue recognition, (ii) management override of controls, (iii) lack of appropriate documentation for amounts receivable related to investment banking work as derivative assets and warrants, (iv) lack of audit evidence for loans and improper classification of loan performance and valuation of loans, (v) lack of definite documentation as to repayment of the note receivable by Fund Management, (vi) improper and unclear valuation for SPVs owned by Master Fund, and (vii) other control issues, such as inadequate records maintenance and loan management systems. The draft report was not made public or otherwise known to investors.

73.   Thus, by early 2018, the Grant Thornton Defendants had actual knowledge of improper recognition and reporting of the Funds' assets, and actual knowledge that calculations of Master Fund's NAV was based on unverifiable figures.

74.   Certain officers of Fund Management, having been advised of the Grant Thornton Defendants' concerns, asked the Grant Thornton Defendants to tailor the final audit report to accommodate the purported business practices that such individuals were causing Fund Management to engage in, to justify (at least in part) the Funds' stated financials.  Despite their

actual knowledge of the improper conduct, and in violation of applicable accounting standards, the Grant Thornton Defendants agreed.

75. As a result, the Grant Thornton Defendants provided a final qualified audit report for 2017, dated April 30, 2018, for publication with Master Fund's financial statements that either downplayed these significant control issues, or outright omitted them. For example, the Grant Thornton Defendants' unpublished draft report described a systemic deficiency in the revenue recognition policy, while the final report suggested the issue is limited to investment banking income recognition.  Further, while the draft report correctly pointed out that there was no documented means or timeframe for the repayment of the purported note receivable from Fund Management, the final audit glossed over this by stating that recovery was dependent on the continued operations of Master Fund.  In addition, the draft report identified numerous instances of inadequate procedures to comply with basic accounting standards, but the final report did not disclose or account for these deficiencies at all. In sum, the final report mischaracterized or omitted the scope and severity of numerous deficiencies that the Grant Thornton Defendants had included in their unpublished draft report.

76. Moreover, the Grant Thornton Defendants' April 30, 2018, qualified opinion contained in the Funds' financial statements for 2017 should have been based on the Grant Thornton Defendants' internal audit report for 2017, yet that internal audit report was not even completed until mid-July 2018.  Thus, the Grant Thornton Defendants provided its opinion on the Funds' financial condition for publication before it had even completed its full review of material issues affecting that financial condition.

77. The Grant Thornton Defendants' final audit report for 2017 hid from the Independent Directors the serious control issues that eventually led to the failure of the

Receivership Entities' business and intervention by the SEC even though these issues were known by the Grant Thornton Defendants when they issued their audit report, which should have led the Grant Thornton Defendants to issue an adverse opinion for that year.

78.     Because the Grant Thornton Defendants agreed to be "flexible" in preparing and finalizing the 2017 audit report, certain individuals at Fund Management agreed to continue the relationship with the Grant Thornton Defendants for the 2018 financial statements.

79.     The Grant Thornton Defendants planned the 2018 audit around the significant control and accounting deficiencies and other issues and improprieties that it had uncovered. For example, the agenda for a meeting between certain officers of Fund Management and the Grant Thornton Defendants, conducted at Fund Management's South Florida office, provided for "changes to [audit] approach" to bend their analysis favorably toward Fund Management's business model to address the various issues from the 2017 audit.

80.     Significantly, throughout this process, the Grant Thornton Defendants contacted various borrowers of Master Fund, many of them located in Florida or the United States, to confirm the legitimacy of the supposed investment advisory fees and investment banking fees payable from those borrowers. The vast majority of responses the Grant Thornton Defendants received from such borrowers were disputing the alleged fees and claiming that no services were provided or approved by the borrowers, such as:

- "I have no idea with this is about."

- "Let me get this straight these are fees TCA says I owe them? I thought this was for the loan amount I never closed on."

- "There [were] no services rendered by TCA . . .."

81.     Some borrowers claimed that Fund Management was engaged in a fraud and

threatened referrals to government agencies. According to one insider, at least 90% of the investment banking fees could not be confirmed by the Grant Thornton Defendants. In fact, of 104 audit confirms sent by the Grant Thornton Defendants for the 2018 Audit, only three were returned without material changes to amounts claimed to be owed by Master Fund. Thus, the Grant Thornton Defendants knew that the debt included in Master Fund's books simply did not exist as was being represented to investors, or at least could not be verified. These amounts totaled more than $70 million in purported income in 2017 alone.

82.     In April 2019, despite the Grant Thornton Defendants' prior willingness to be "flexible," the Grant Thornton Defendants indicated that a qualified opinion was not an option for the 2018 financials because of the various qualifications and materiality of those issues. The Grant Thornton Defendants expressed their intent to issue an "adverse" opinion because the financial statements ***did not*** fairly represent the Funds' financial condition. Even after the Grant Thornton Defendants determined that Master Funds financial statements were inaccurate, the Grant Thornton Defendants offered to issue a disclaimer stating that they had been unable to provide a basis for an audit opinion for lack of appropriate audit evidence.

83.     Clearly, the Grant Thornton Defendants were fully aware of material problems with Master Fund's revenue recognition practices and other issues discussed above by at least early 2019. Yet despite their knowledge, the Grant Thornton Defendants never advised the Independent Directors about these issues, despite the Grant Thornton Defendants having acknowledged their responsibility to do so.

84.     After learning that the Grant Thornton Defendants were going to issue an adverse opinion, Greg O'Driscoll, a partner of GT Cayman, spoke with Matthew Wrigley of Fund Management about finding a path around an adverse opinion. Mr. Wrigley used his relationships

with the Grant Thornton Defendants' clients and potential clients as leverage to convince the Grant Thornton Defendants to change their mind about issuing an adverse opinion. Indeed, less than forty-eight hours after this conversation, the Grant Thornton Defendants provided a roadmap to obtain another qualified opinion for 2018. Specifically, the Grant Thornton Defendants recommended obtaining an independent valuation of the SPVs to ensure that various loans were consistent with the IFRS. If these steps were taken, then the Grant Thornton Defendants were willing to provide a final audit opinion with qualifications as to only two line-items.  In other words, the Grant Thornton Defendants offered to turn a blind eye to the significant accounting inconsistencies and improper controls, and never report these issues to the Independent Directors, so that Fund Management could continue employing deceptive business and accounting practices.

85.     When the Grant Thornton Defendants offered the foregoing pathway to avoid an adverse opinion or disclaimer, they also offered to work with certain Fund Management officers to tailor the wording of potentially negative audit findings to minimize investor concerns. Specifically, John Glennon, a partner of GT Ireland, informed Matthew Wrigley that the Grant Thornton Defendants would provide a new opinion in draft form with no changes from the adverse opinion, other than turning the "adverse" opinion into a "qualified" opinion. Additionally, between April 30, 2019, and July 16, 2019, several discussions took place in which Master Fund dictated changes to the 2018 report which the Grant Thornton Defendants acquiesced to.

86.     Unsurprisingly, Fund Management accepted the Grant Thornton Defendants' recommendation and produced a purportedly independent third-party valuation of the SPVs. Relying on these valuations, and despite actual knowledge of the significant accounting inconsistencies and improper controls discussed *infra*, the Grant Thornton Defendants prepared and finalized a qualified 2018 audit opinion — instead of an adverse opinion or disclaimer that

they previously said was necessary. Shortly before the new draft "qualified" opinion was circulated, the Grant Thornton Defendants communicated to Mr. Wrigley and Alyce Schreiber of Fund Management that outstanding audit fees had not been paid. Officers and directors of Fund Management interpreted the timing of this payment demand as "blackmail".

87.     Fund Management included the Grant Thornton Defendants' qualified opinion in the Funds' 2018 financial statement for publication and dissemination to the Funds' Independent Directors, who were relying on the Grant Thornton Defendants to bring any improprieties to their attention.

88.     At bottom, the Grant Thornton Defendants knew of the improper practices that certain insiders of Fund Management were causing and understood that these practices were misstating financial information to the Independent Directors who were relying on such information.  But instead of exposing those issues in their independent audits and revealing the financial deception to the Independent Directors of the Funds—which is a primary function of an independent auditor—the Grant Thornton Defendants failed to prevent this wrongful conduct rather than risk losing the engagement and substantial fees that it was being paid by Master Fund.

89.     Apart from the qualifications included in the Grant Thornton Defendants' audit opinions, the Grant Thornton Defendants certified in their opinions that the financial statements of Master Fund "present fairly" the Funds' financial position. The Grant Thornton Defendants knew this certification was false.

90.     Indeed, through the final audit reports for 2017 and 2018, the Grant Thornton Defendants provided bad actors within Fund Management with a way to justify severe accounting irregularities by producing and certifying qualified audit opinions. The Grant Thornton Defendants' opinions willfully disregarded and covered up what the Grant Thornton Defendants

knew: there was little to no backup for the tens of millions of dollars in unearned, unpaid, and/or unrecoverable "investment banking" fees, among other misconduct.

91.     Through their improper coordination with certain bad actors at Fund Management, the Grant Thornton Defendants prolonged the fraudulent and improper accounting practices described above and caused and exacerbated significant damages to the Funds, including causing Master Fund to incur and/or pay inflated management fees and incentive fees to Fund Management and GP. Fund Management and GP overcharged the Funds approximately $10.5 million because of erroneous and/or willfully inaccurate calculations based on investment advisory fees and other income that the Grant Thornton Defendants knew did not exist or would never be paid. In addition, the Grant Thornton Defendants' misconduct caused the Funds to make erroneous, inflated redemption payments to investors that were calculated based upon erroneous, inflated NAV calculations. Additionally, Master Fund paid the Grant Thornton Defendants fees of nearly $1 million, which the Grant Thornton Defendants were not entitled to receive because of its breaches alleged herein. The Grant Thornton Defendants' misconduct also caused the Funds to incur litigation-related damages, including the costs of the Receivership, the costs of the Receiver's counsel and other professionals, as well as damages in the form of claims asserted by investors against the Funds for lost investments, all of which could have and should have been avoided if the Grant Thornton Defendants had given the Independent Directors the accurate information about the Funds' financial condition, which would have allowed the Independent Directors to remediate the situation and/or to wind down and close the Funds in an orderly manner. Instead, because of the Grant Thornton Defendants' conduct, the Funds continued to operate and incur liabilities long past the point of insolvency and financial viability, including continuing to accept funds for new subscriptions, which were unfulfilled as of January 21, 2020, when the Feeder Funds

sent letters to their investors advising that the Funds would be winding up their affairs.

92.     The Grant Thornton Defendants' purportedly independent audit opinions provided a false sense of security to the Independent Directors, who relied on those opinions and were relying on the Grant Thornton Defendants to evaluate Master Fund's financials and bring any improprieties or accounting irregularities to the Independent Directors' attention so that they could take appropriate actions to protect the Funds.

93.     The Grant Thornton Defendants had actual knowledge of, or at the very least was willfully blind to, Fund Management's breaches of fiduciary duties alleged above and of the fraud that Fund Management perpetrated. Without limitation, the Grant Thornton Defendants knew that:

a.  The Funds lacked support for tens of millions of dollars in purported revenues, including "advisory fees" and "investment banking fees" from borrowers, many of whom had expressly advised the Grant Thornton Defendants that no such services had been requested or provided;

b.  There was a lack of support for tens of millions of dollars in loan receivables to borrowers of the Funds' books;

c.  The Funds lacked support for its loans to third parties;

d.  Certain assets on the Funds' books were valued in a manner that was not in accordance with accounting standards;

e.  Certain of the Funds' income recognition was improperly timed in violation of accounting standards;

f.  Certain loans on the Funds' books were improperly classified in violation of accounting standards;

g.  Certain loans on the Funds' books lacked evidence to support the collectability of such loans;

h.  Litigation outcomes relating to enforcement of bad loans were exaggerated;

i.  Certain officers of Fund Management had overridden controls aimed at preventing fraud or overreaching;

j.  Certain SPVs were improperly overvalued; and

k.  Fund Management lack adequate records maintenance and loan management systems.

94.  The Grant Thornton Defendants were grossly negligent by:

a.  Failing to include in their final 2017 audit report what the Grant Thornton Defendants knew about the serious control issues, revenue recognition deficiencies, loan receivables and accounting issues at Fund Management that eventually led to the Funds' failure;

b.  Failing to disclose that the Grant Thornton Defendants could not confirm with borrowers 90% of investment banking fees purportedly owed to Master Fund;

c.  Failing to issue an adverse opinion in 2018, and suggesting instead that Fund Management obtain a third-party valuation company to obscure the numerous issues and allow the Grant Thornton Defendants to rely on that valuation to issue another qualified opinion;

d.  Deviating from its normal practices, procedures and methodologies in violation of industry standards;

e.  Ignoring data in the Grant Thornton Defendants' possession that contradicted conclusions reached in their audit reports; and

f.  Lending its name and credibility to Fund Management.

95.  The Grant Thornton Defendants knew that their final audit reports would be relied upon by the Independent Directors of the Funds, as well as investors.  Had the Independent Directors known of the acts described herein and/or the true value of the Funds and issues plaguing the Funds' investments, which the Grant Thornton Defendants knew about and failed to disclose, the Independent Directors would have put an end to such improper practices.

96.  The Independent Directors were unaware of, nor could they have discovered through the exercise of reasonable diligence, the materially false and misleading representations and omissions regarding the Grant Thornton Defendants' final audit reports because the Independent Directors were not provided access to, and did not access, Fund Management's financial records.

97.     The Grant Thornton Defendants knew that the Independent Directors would receive the final audit reports and rely to the Funds' detriment upon the above misrepresentations and omissions, and, indeed, intended for such Independent Directors to rely on those misrepresentations and omissions. The Grant Thornton Defendants knew that Independent Directors would use the final audit reports to make decisions about the operations of the Funds and performance of Fund Management.

98.     The Independent Directors were reasonable in relying upon the misrepresentations and omissions in the final audited financial statements prepared by the Grant Thornton Defendants, which is an international accounting firm.

99.     All conditions precedent to the filing of this action have been performed, waived, or otherwise excused.

### COUNT I: BREACH OF DUTY
### By the Funds Against the Grant Thornton Defendants
### (Under Cayman Law)

100.    The Receiver re-alleges and incorporates paragraphs 1 through 99, above, as though fully set forth herein.

101.    The Grant Thornton Defendants owed the Funds a duty to provide audit services with the same degree of care that a reasonably competent auditor would provide.

102.    Further, under US GAAS the Grant Thornton Defendants were required, *inter alia*, to maintain an independent and objective attitude towards its audit client; exercise due professional care in the performance of the audit and preparation of its report; obtain a sufficient understanding of its client's internal controls to be able to plan the audit and determine the nature, timing, and extent of tests necessary to perform; and obtain sufficient competent evidential matter through inspection, observation, inquiry, and confirmations to afford a reasonable basis for its opinions.

103.    The Grant Thornton Defendants breached their duties to the Funds by engaging in the conduct alleged herein with reckless disregard for the consequences of such conduct, or with knowledge that such conduct was a breach of duty or grossly negligent as to whether it was a breach of duty.

104.    As a direct, proximate, and reasonably foreseeable result of the foregoing, the Funds sustained actual damages in an amount to be proven at trial.

**WHEREFORE**, the Receiver demands judgment against the Grant Thornton Defendants as follows: awarding damages in amounts to be determined at trial; (ii) awarding attorney's fees as permitted by law; (iii) awarding pre- and post-judgment interest, costs and disbursements; (iii) awarding aggravated and exemplary/punitive damages; and (iv) awarding such other and further legal and equitable relief as the Court deems just and proper.

## COUNT II: DISHONEST ASSISTANCE
### By the Funds Against the Grant Thornton Defendants
### (Under Cayman Law)

105.    The Receiver re-alleges and incorporates paragraphs 1 through 99, above, as though fully set forth herein.

106.    The Grant Thornton Defendants dishonestly assisted certain officers or directors of Fund Management to breach Fund Management's fiduciary duties to the Funds by inflating the monthly NAV.

107.    The Grant Thornton Defendants dishonestly assisted certain officers or directors of Fund Management in causing the Funds to dispose of assets in breach of trust or fiduciary duty, including to pay Fund Management and GP's inflated management fees and performance/incentive fees, and inflated redemptions based on the inflated NAV.

WHEREFORE, the Receiver demands judgment against the Grant Thornton Defendants as follows: awarding damages in amounts to be determined at trial; (ii) awarding attorney's fees as permitted by law; (iii) awarding pre- and post-judgment interest, costs and disbursements; (iii) awarding aggravated and exemplary/punitive damages; and (iv) awarding such other and further legal and equitable relief as the Court deems just and proper.

**COUNT III: BREACH OF CONTRACT**
**By the Funds Against the Grant Thornton Defendants**
**(Under Cayman Law)**

108.     The Receiver re-alleges and incorporates paragraphs 1 through 99, above, as though fully set forth herein.

109.     The Engagement Letters are valid, enforceable contracts between the Grant Thornton Defendants and the Funds.

110.     The Grant Thornton Defendants breached their obligations under the Engagement Letters by engaging in the conduct alleged hereinabove.

111.     The Funds suffered damages as a direct, foreseeable, and proximate result of the Grant Thornton Defendants' breaches.

**WHEREFORE**, the Receiver demands judgment against the Grant Thornton Defendants as follows: awarding damages in amounts to be determined at trial; (ii) awarding attorney's fees as permitted by law; (iii) awarding pre- and post-judgment interest, costs and disbursements; and (iii) awarding such other and further legal and equitable relief as the Court deems just and proper.

**<u>NOTICE UNDER RULE 44.1, FED. R. CIV. P.</u>**

In accordance with Rule 44.1 of the Federal Rules of Civil Procedure, notice is given that the Receiver raises issues of foreign law with respect to Counts I, II, and III.

## <u>DEMAND FOR JURY TRIAL</u>

The Receiver demands a trial by jury as to all facts, issues, and claims that are so triable.

DATED: January 17, 2024.

> VENABLE LLP
> *Attorneys for Jonathan E. Perlman, Receiver*
> 100 N. Tampa Street, Suite 2600
> Tampa, Florida 33602
> Telephone: (813) 439.3100
> Telecopier: (813) 439.3110
>
> By: _/s/ Eric D. Jacobs_
>     Eric D. Jacobs, Esq. (FBN 85992)
>     EJacobs@venable.com
>     Gregory M. Garno, Esq. (FBN 87505)
>     GMGarno@venable.com
>     Michael A. Friedman, Esq. (FBN 71828)
>     MAFriedman@venable.com